Filed 2/5/15  P. v. Yohannes CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ESAYAS KEBEDOM YOHANNES,<br><br>Defendant and Appellant. | A131843<br><br>(Alameda County<br>Super. Ct. No. C161751) |

After a jury trial, defendant Esayas Kebedom Yohannes was found guilty of various crimes committed against S. Doe, T. Doe, and R. Doe.  The jury found defendant had committed the following crimes against S. Doe: forcible rape (Pen. Code, § 261, subd. (a)(2) [1]) (six counts) and true findings on related enhancements for use of a deadly weapon, aggravated kidnapping, and commission of sex offenses against multiple victims (§§ 667.61, subds. (c), (d)(2), (e)(4), 12022, subd. (b) & (b)(1), 12022.3); forcible oral copulation (§ 288a, subd. (c)(2)) (two counts) and true findings on related enhancements for use of a deadly weapon and aggravated kidnapping (§§ 667.61, subds. (d)(2), (e)(4), 12022, subd. (b) & (b)(1), 12022.3); forcible sodomy (§ 286, subd. (c)(2)) (three counts) and true findings on related enhancements for use of a deadly weapon and aggravated kidnapping (§§ 667.61, subds. (d)(2), (e)(4), 12022, subd. (b) & (b)(1), 12022.3), and kidnapping to commit rape, oral copulation and sodomy (§ 209, subd. (b)(1)).  The jury found defendant had committed the following crimes against T. Doe: kidnapping to

---

[1]     All unspecified statutory references are to the Penal Code.

commit rape, oral copulation and sodomy (§ 209, subd. (b)(1)) and forcible oral copulation (§ 288a, subd. (c)(2)) with true findings on related enhancements for aggravated kidnapping and commission of sex offenses against multiple victims (§§ 667.61, subds. (c), (d)(2)). The jury found defendant had committed the following crimes against R. Doe: forcible oral copulation (§ 288a, subd. (c)(2)); unlawful sexual intercourse with a person under the age of 18 (§ 261.5), as a lesser offense of forcible rape; and unlawful oral copulation with a person under the age of 18 (§ 288a), as a lesser included offense of forcible oral copulation.[2] The court sentenced defendant to both indeterminate and determinate terms recorded in its minute orders as an aggregate sentence of 310 years to life in state prison.

Defendant challenges the sufficiency of evidence to support certain convictions, and the court's instructions and responses to the jury's questions during deliberations. He also contends the court erred in denying his motion to unseal juror contact information to aid in filing a motion for a new trial based on juror misconduct. We conclude defendant's arguments are without merit, and accordingly, we affirm the judgments of convictions. Although the parties have not requested us to do so, we shall remand the matter for resentencing to allow the court to clarify discrepancies between its oral pronouncement of sentence and its sentence minute orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

The charges against defendant were based on the complaints of three women who alleged that defendant had held them against their will and forced them to engage in sexual acts without their consent. Defendant did not dispute he engaged in sexual conduct with the three victims. His defense was that he had consensual sex for money with all three women, who were prostitutes, and the women had made false claims against him because he refused to pay for their services as he had promised. At a jury trial held in January 2011, the following relevant testimony was elicited.

---

[2] The jury also returned not guilty verdicts on several counts (kidnapping to commit another crime, forcible oral copulation, forcible rape, second degree robbery), which concerned R. Doe.

2

### A. The Prosecution's Case:

#### 1. July 16, 2007 - R. Doe (Counts 15-21)

On July 16, 2007, at 9:00 p.m., at 12th Street and Broadway in Oakland, then 16-year-old R. was with a friend. She was on probation for a juvenile prostitution incident and had just completed a period in which she was required to wear an ankle bracelet to monitor her whereabouts as a condition of probation. She denied she was then working as a prostitute. R. saw a car being driven by defendant. Defendant stopped his car and attempted to talk to R. who tried to ignore him. Defendant got out of the car and forced R. into the car and drove away. R. was crying and defendant told her to stop. He drove to an area in Oakland occupied by big rig trucks and uninhabited buildings. R. repeatedly asked defendant to let her go. He took out a hammer and hit her. He said if R. did what he said, he would not hurt her. He also said he was the police and would put her in jail if she did not listen to him. Although defendant was not wearing a uniform, R. believed him. Defendant took R.'s phone, her money, and her jewelry. Defendant forced R. to engage in several sexual offenses including two incidents of oral copulation and two incidents of vaginal sexual intercourse. Defendant hit her with a gun and ordered her to drink alcohol. He asked her if she wanted to spend the night with him and she said no. About two hours later, he told her to get out and she did. He said no one would believe her if she complained about his conduct. He threw her phone at her, but did not return her money or jewelry. After he drove away, R. called a friend and someone picked her up and took her home.

R.'s mother took her to the hospital but an examination could not be performed and they went home. R. did not initially call the police because she did not want to testify. The day after the incident she went to Planned Parenthood to get tested for STDs. On a subsequent visit to Planned Parenthood, she told the staff that she had been raped and the police were called. The police took R. to the hospital for an examination. At the hospital, R. reported she had been threatened with a gun and a hammer but not hit, had been coerced into drinking alcohol, vaginally penetrated by defendant's penis and forced to orally copulate him, and she had arm and mouth pain. There were no findings of

3

injuries to R.'s genital area or anus, which could have resolved by the time of the examination, and there were no noticeable injuries to her body or head. R.'s vaginal swab had sperm that contained a DNA profile consistent with defendant's DNA profile. R. identified defendant from a six-pack of photos.

### 2. December 6 – 7, 2008 – S. Doe (Counts 1-12)

On December 6, 2008, at 6:00 p.m., then 19-year-old S. was working as a prostitute on East 14th Street and Seventh Avenue in Oakland. Defendant stopped his car and asked S. for sex. She told him $80, but he only had $40. She refused and also said she would not perform sex without a condom. He drove away.

After dates with two other men, S. saw defendant in the same car a couple of hours later about 8:00 p.m. Defendant offered her $60 and S. got into defendant's car. They drove to an area where there were a lot of big rig trucks. Defendant tried to open the door of several trucks and eventually opened the door of one of the trucks and they got in. Defendant paid S. $60 and then they had sex. Defendant used a condom supplied by S. When they were done, S. put on her clothes. When she turned around, she saw that defendant was standing there naked. He was clicking something behind his back and said, "Bitch take off your clothes. You're not going anywhere." S. thought the clicking sound was a gun and she started to cry. She asked defendant not to kill her and to let her go. Defendant said he wanted to have sex one more time and then he would let her go. S. asked to use a bathroom. Her request was a ruse to allow her to get out of the truck and escape. Defendant, still naked, got out first and S. followed him. She pulled down her panties, urinated and defecated on the ground, and asked for a tissue. When defendant went back to the truck, S. ran away. Defendant caught her after she had run about 24 feet. He grabbed her by her hair and her neck and dragged her back to the truck. She was screaming and trying to get him to let her go. He said, "Bitch, you're not going anywhere." They went back into the truck and defendant started to pull off S.'s shoes. She was screaming and kicking, and saw that he had a box cutter.

Over the next several hours until 5:30 p.m. the next day, defendant kept S. in the truck and forced her to have sex numerous times: vaginal sex more than six times, anal

4

sex at least three times, and oral sex at least twice. Defendant placed a lubricant on himself and then on S. He also drank vodka from a bottle and forced S. to drink vodka that he poured in a cup for her. At one point S. picked up a screw and tried to force it into defendant's neck. He choked her until she dropped the screw, and said, "Bitch, you're not going anywhere. I'm going to keep you here for two weeks like I did the other girls." S. ultimately lost consciousness and when she woke up defendant was drinking. She was afraid because defendant had the box cutter, but she told him she would do anything if he let her go. Defendant ultimately let her go, drove her to the BART station, and gave her $10. He said he had assaulted her for several reasons including that he had seen her twice and she was a beautiful black woman who should be doing something else with her life, "not hoeing."

When S. got home she called the police. When the officers arrived, they drove her to the area where the sexual assault had taken place and then to the hospital. Her examination at the hospital did not reveal any semen but stomach, vaginal, and anal swabs were done; defendant could not be eliminated as a sperm donor. The examination revealed she had an abrasion in the inner labia and tenderness at the perineum. Her neck was tender, but there were no red marks or hand marks on her neck. She had broken blood vessels in her eyes that could have been the result of choking but there was no indication that any choking had caused S. to lose consciousness. She had broken capillaries in her mouth that could have been the result of oral sex or forced vomiting. S. picked defendant's photograph from a photo lineup. She identified the truck where she had been sexually assaulted. After securing a search warrant, the officers searched defendant's truck and found a vodka bottle, box cutter, and lubricant. Defendant was ultimately arrested on January 20, 2009, on charges of sexually assaulting S., and he was held for three or four days before being released from custody.

### 3.    January 29, 2009 – T. Doe (Counts 13-14)

On January 29, 2009, at about 5 p.m., then 19-year-old T. was working as a prostitute at International and 29th Street. Defendant drove up to the intersection where T. was standing. They made a deal to have sex for $60. T. had seen defendant before,

but never really talked to him. They drove in defendant's car to a truck stop area and then got into a big rig truck that had a bed inside. Defendant gave some money to T. They undressed and had vaginal sexual intercourse on the bed. Defendant used a condom. When T. got up to put on her clothes, she noticed defendant's facial expression had changed, making her feel uncomfortable. Defendant grabbed her hard by putting his left hand to the center of her neck and said, " 'Bitch, you're not going nowhere until he gets ready.' " While grasping T.'s neck tightly, defendant pulled her about five and a half feet into the back area of the truck towards the bed. He ordered T. to take off her clothes and said, "Bitch, sit down and suck my penis." T. said she just wanted to get out of there and go home to her child, and defendant stated, "it depends on how" he felt after she was done. T. complied with defendant's demand by sucking his penis without a condom. She felt she could not fight him inside the truck, she was not going to get away, she was afraid, and she was scared that if she did not do what defendant wanted something else would happen. She sucked his penis for a couple of minutes and then said she had to use a bathroom. While they were still both naked, defendant took T. to "the passenger door," and told her "to use it from the top of the diesel truck." Defendant held T.'s left arm, while she held the truck door so she could urinate. As she was urinating, T. heard the brakes of another truck being driven by David Rodezno. Pulling her arm away from defendant, T. ran into the parking lot. Defendant ran after her. After running about 47 feet, defendant caught T., grabbed the back of her hair and dragged her through the mud as he pulled her back to the truck. T. was kicking and swinging, trying to fight him off. Defendant said, "Stop, bitch, I'll let you go. Just stop." T. replied, "No, just leave me alone. Leave me alone." When another diesel truck entered the lot, defendant released T. and she ran toward Rodezno's truck. She jumped onto the hood of Rodezno's truck, and screamed to him to call the police. Defendant jumped into his car and drove away. About two minutes later defendant came back. Now fully clothed and wearing something tied around his face, defendant got out of his car and entered his truck and drove away. When the police arrived, they told T. they had caught defendant elsewhere. Still naked, T. was wrapped in a sheet and taken to the location where defendant had been

6

stopped. She made an on-the-scene identification of defendant. Rodezno also made an on-the-scene identification of defendant at the location where defendant had been stopped by the police.

### B. The Defense Case

Testifying in his own defense, defendant admitted since 1995 or 1996, he habitually picked up prostitutes once every week or two, and had been convicted on two occasions for soliciting prostitutes in the 1990's. He had a girlfriend from 2001 to 2007, and during that period he did not solicit prostitutes. He never had any problems with prostitutes he solicited except for the three women who had pursued charges against him in this case. Most of the time he paid prostitutes what they expected to be paid by him. In the 15 years he solicited prostitutes, these three incidents were the only times he had not fully paid for services.

Defendant testified as to his recollection of his encounters with the three victims. Sometime in 2007, between 9 p.m. and 10:00 p.m., R. waved to him while he was driving at International and 45th, and not on Broadway and 12th Street as she had testified. She asked if he wanted a "date," and he replied, yes and agreed to pay her $50 for "head (oral sex) and sex." R. said she was 18, and defendant believed her. R. got into defendant's car and said she knew a safe place for sex and they drove there. They got into the back seat of the car, defendant gave R. $50, and they started to undress. When defendant said he did not have a condom, he offered to give her an additional $50 later if she agreed to have sex without a condom. She agreed. They had oral and vaginal sex and then dressed. R. asked for the additional $50. Defendant told her he was driving to an ATM machine. Instead, he drove to East 14th and told her to get out of the car. He said he was not going to give her any more money and she got upset and swore at him. Defendant denied that he had a hammer or hit R. with any kind of object. Nor did he grab her by the arm and force her into his car. Defendant did not know how R. got a bruise on her arm. Defendant also denied that he put a gun to R.'s head or told her he was a police officer and no one would believe her if she reported the incident. His decision not to pay R. was not planned but happened because neither had a condom. He wanted to have sex with

7

her, so he told her he would give her another $50 for sex without a condom. But, he believed $50 was enough money for her sexual acts.

Regarding the second woman, defendant testified that he first met S. at International Boulevard and 12th Street in Oakland on December 8, 2008, at 3:00 p.m. She indicated with a movement of her head that she was working as a prostitute. S. got into defendant's car, and he asked for "sex and head." She informed him that the cost was $60 if defendant used a condom, or $80 without a condom. Because defendant only had $40, S. said no and got out of the car. An hour later, defendant saw S. on International and 21st Street. At that time she agreed to oral and vaginal sex for $60, if defendant used a condom. She got into defendant's car and he drove to the area where he had parked his truck. They got into the truck and defendant gave her $60. They had oral and vaginal sex. Defendant used a condom. They also drank vodka and talked for about five to 10 minutes. S. then asked to leave, but defendant offered her $100 if she would have sex again without a condom. She agreed. Drinking vodka for about 45 minutes left them "kind of drunk." They had oral and vaginal sex, but this time defendant did not use a condom. As they began to get dressed, S. asked for her money and defendant said he would pay her fee later. While driving S. to a BART station, defendant decided not to pay her the additional $100 because she had drunk some of his vodka and they had "had fun" together. S. became upset and threatened to "get" him. Defendant denied he "kept" S. for 20 hours. He claimed he was with her "from four something to six o'clock or so," and she never spent the night with him. Defendant initially testified that S. was not drunk when he dropped her off, but "she got sick from the alcohol. And she asked [him] to pull over, and she threw up." He then testified he did not remember if S. was drunk, but that she had drinks; "we were drinking so I can't tell you how much I drink or she drink. We were both drinking it." He admitted he had a box cutter in his truck, but testified he never used it against S. during his sexual encounter with her. Defendant denied any use of force or that he choked S. Defendant did not remember S. saying she had to go to the bathroom or that she went outside the truck and he never grabbed or pulled her hair. S. never tried to stick a screw into his neck and he never had anal sex with her.

8

Regarding the third woman, defendant testified he knew T. as a prostitute, having picked her up on more than one occasion. On the afternoon of January 29, 2009, at 4:00 p.m., defendant saw T. at International and East 14th, and she agreed to oral and vaginal sex for $60 with defendant using a condom. T. got into defendant's car and they drove to the parking lot where his truck was located and parked the car. As T. started to undress in the car, defendant suggested going into the truck because it had more room. T. left her clothes in the car and walked to the truck. She was naked except for her shoes. Defendant was clothed but left his shoes in his car. Once inside the truck, defendant got undressed and they had oral and vaginal sex. Defendant used a condom. He denied he choked or grabbed T. by her throat, and, testified that he did not force her to give him head without a condom. T. asked for $60, but defendant gave her $40. She yelled in protest, said she needed the money, and when she heard a truck coming, said, "I'm going to tell the truck driver or somebody out there that . . . you raped me, because you said 60. It's only 40." She got out of the truck and began to run. Defendant chased her and when he caught her he said he would give her the rest of the money. He waved off the incoming truck driver to communicate that everything was okay. T. never got back into the truck. He did not pull her hair and he did not remember if he ever punched her. Because T. was threatening to claim he raped her, he ran after her and grabbed her arm. They were then facing each other, and defendant had one of his arms "kind of bracing her to [his] body" and his other hand on her arm. He told her, "[F]orget whatever I said. Let's go. I'll give you the rest of the money." She replied, "[N]o, no, no, just leave me alone," and kept screaming and did not calm down. Defendant got nervous and left because the truck driver was there. He ran to his truck and put on his clothes. He moved his car to another parking lot because it was blocking the exit path for his truck. He came back and drove his truck out of the lot and shortly thereafter he was arrested by a police officer.

## DISCUSSION

**I.      Sufficiency of Evidence of Kidnapping To Commit A Sex Offense (Aggravated Kidnapping) and Forcible Oral Copulation With A Related Aggravated Kidnapping Enhancement (Counts 13 and 14 – T.)**

"In assessing a claim of insufficiency of evidence," our task as a reviewing court is "to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence ─ that is, evidence that is reasonable, credible, and of solid value ─ such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]  The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  As we now discuss, we see no merit to defendant's challenges to the sufficiency of the evidence to support the lack of consent and asportation elements of the substantive crime of aggravated kidnapping and the aggravated kidnapping sentence enhancement concerning defendant's criminal conduct against T.

As to the lack of consent element, defendant argues that a prostitute's "[c]onsent, once given, cannot be withdrawn if the 'withdrawal' takes place only in the mind of the woman engaging in sex.  There *must* be something more than 'a look' on the man's face, or some other vague and ambiguous claim regarding the withdrawal of consent.  A conviction for forcible sex acts, cannot be sustained without evidence that the defendant threatened bodily harm, or said or did *something* to induce reasonable fear in the victim.  Clearly in a prostitution/client relationship, it is not unusual for the client to make demanding sounding requests.  In this type of relationship this is part of the norm."  However, the evidence admitted at trial established that after T. dressed and was ready to leave, defendant tightly grabbed her by her throat and said she was not going to leave

10

until he was ready and demanded that she orally copulate him. When she told him she wanted to go home, he said he would determine when she could leave. And true to his statement, when she later ran away defendant pursued her, grabbed her hair, and dragged her back toward his truck. Thus, on this record, the jury could reasonably find defendant's conduct was not "part of the norm" of a client/prostitute relationship, his words and physical force had induced "reasonable fear" in T., and her failure to say no or refuse to commit oral copulation was not acquiescence.

As to the asportation element, we note that in this case the jury was instructed[3] that both the substantive offense of aggravated kidnapping and the aggravated kidnapping sentence enhancement required a showing that defendant's movement of T. (1) "was not merely incidental" and (2) "substantially increased the risk of harm [to the victim]. . . . These two elements are not mutually exclusive but are interrelated." (*People v. Vines* (2011) 51 Cal.4th 830, 869-870.) "With regard to the first prong," the jury was asked to consider "the 'scope and nature' of the movement, which includes the actual distance a victim is moved. [Citations.] There is, however, no minimum distance a defendant must move a victim to satisfy the first prong." (*Id*. at pp. 870-871.) With regard to the second prong, the jury was asked to consider "whether the movement subject[ed] the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying criminal offense]," including "consideration of such factors as the decreased likelihood of

---

[3] Although the aggravated kidnapping sentence enhancement requires a finding that "the movement of the victim *substantially* increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense" (§ 667.61, subd. (d)(2); italics added), the substantive offense of aggravated kidnapping eliminates the word, "substantially," and requires only that the movement increase the risk of harm to the victim (§ 209, subd. (b)(2); Stats. 1997, ch. 817, § 2, p. 5519). Nevertheless, because the trial court here instructed the jury that for both the substantive crime of aggravated kidnapping and the aggravated kidnapping sentence enhancement, the jury had to find defendant's movement of T. "substantially" increased the risk of harm to her, we have considered whether the evidence was sufficient to support a finding that defendant's movement of T. substantially increased the risk of harm to her with regard to both the substantive aggravated kidnapping offense and the aggravated kidnapping sentence enhancement.

detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes." (*Id.* at p. 870.)

In arguing the evidence of asportation was insufficient, defendant asks us to consider that T. initially agreed to go with him into the truck for the purposes of prostitution, that "it appears no movement occurred within the truck," and there was no testimony that T. "was subject to substantial movement which increased her risk of harm due to force." However, the jury could reasonably consider the entirety of the encounter between T. and defendant from the moment in the truck when he tightly grabbed her throat, dragged her five and a half feet to the back of the truck near the bed, ordered her to undress and orally copulate him, through her foreseeable escape during which defendant dragged her back toward his truck and her ultimate successful escape by jumping onto the hood of Rodezno's truck. Because the commission of sexual offenses does not " 'necessarily require movement to complete the crime,' " " '[w]here a defendant drags a victim to another place, and then [commits sexual offenses], the jury may reasonably infer that the movement was neither part of nor necessary to the' " commission of the sexual offenses. (*People v. Shadden* (2001) 93 Cal.App.4th 164, 169 [moving rape victim nine feet from front of store to back room of same premises sufficient to support asportation].) " '[C]onsider[ing] the "*scope and nature*" of the movement,' as well as '*the context of the environment in which the movement occurred*' " (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1151-1152, quoting *People v. Rayford* (1994) 9 Cal.4th 1, 12), the jury here could reasonably find defendant's movement of T. both inside and outside the truck substantially increased her risk of harm.

12

## II. Trial Court's Instructions and Responses to Jury's Questions During Deliberations

Defendant makes several interrelated arguments challenging the trial court's instructions and responses to the jury's questions during deliberations regarding the substantive offenses of kidnapping to commit certain sex offenses (Counts 12 (S.) and 13 (T.)) and the aggravated kidnapping sentence enhancements (Counts 1-11 (S.) and 14 (T.)). As we now discuss, we conclude these arguments are not persuasive.

### A. Relevant Facts

As part of its instructions on the substantive crimes of forcible rape, forcible sodomy, and forcible oral copulation, the trial court advised the jury that the prosecution must prove that defendant had engaged in the enumerated sexual offenses against the victims' will, i.e., "without the consent of the alleged victim." The jury was also instructed that as to each of the substantive offenses of forcible rape, forcible sodomy, and forcible oral copulation, "criminal intent must exist at the time of the commission of the __ (crime charged) __. [¶] There is no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in [sexual intercourse] [oral copulation] [sodomy][.] [¶] Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge[.] [, unless the defendant thereafter became aware or reasonably should have been aware that the other person no longer consented to the sexual activity.] [¶] [However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief.] [¶] If after a consideration of all the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the accused sexual activity, you must find [him] not guilty of the crime."

As part of its instructions on the substantive crime of kidnapping to commit certain sex crimes, the trial court advised the jury that the prosecution had to prove: (1) "a person was unlawfully moved by the use of physical force" or "unlawfully

13

compelled to move because of a reasonable apprehension of harm;" (2) the movement of the person was caused with the specific intent to commit rape, sodomy or oral copulation, and the person causing the movement had that specific intent when the movement commenced; (3) the movement of the person was without the person's consent; (4) the movement of the person was for a substantial distance, that is, a distance more than slight, brief, or trivial; and (5) the movement substantially increased the risk of harm to the person moved, over and above that necessarily present in the crime of rape, sodomy or oral copulation itself. (CALJIC No. 9.52.1)[4] The jury was also advised: "When one consents to accompany another, there is no kidnapping so long as the condition of consent exists. [¶] To consent, a person must: [¶] 1. Act freely and voluntarily and not under the influence of threats, force, or duress; [¶] 2. Have knowledge that [she] was being physically moved; and [¶] 3. Possess sufficient mental capacity to make an intelligent choice whether to be physically moved by the other person. [¶] [Being passive does not amount to consent.] Consent requires a free will and positive cooperation in act or attitude." (CALJIC No. 9.56.)

As part of its instructions on the aggravated kidnapping sentence enhancements, the trial court advised the jurors that the enhancement was to be considered if the jury found defendant guilty of the substantive sexual offenses (forcible rape, forcible oral copulation, forcible sodomy) in Counts 1 through 11 and 14. To make a true finding as to the sentence enhancement, the jury had to find that the prosecution proved: (1) defendant took, held, or detained the victim by the use of force or by instilling reasonable fear; (2) using that force or fear, defendant moved the victim or made the

---

[4]     The record indicates defense counsel asked the court to use CALJIC instructions and the prosecutor asked the court to use CALJIC instructions when available and CALCRIM instructions for sentence enhancements that were not included in the CALJIC instructions. Thus, as proposed by both counsel, the trial court used CALJIC No. 9.52.1 to instruct the jury on the elements of the substantive offense of kidnapping to commit certain sex offenses. That instruction does not include an optional element that the prosecution must prove that defendant did not actually and reasonably believe the other person consented to the movement, which is included in the corresponding CALCRIM No. 1203 patterned instruction.

14

victim move a substantial distance; (3) the movement of the victim substantially increased the risk of harm to that victim beyond that necessarily present in the crimes of rape, sodomy, or oral copulation; and (4) the victim did not consent to the movement. (CALCRIM No. 3175.) The trial court did not include the optional portion of the patterned instruction, which states the prosecution must also prove: "5. The defendant did not actually and reasonably believe that [the victim] consented to the movement." (CALCRIM No. 3175.)

During deliberations, the jurors requested the following read backs: (1) R.'s testimony under the prosecutor's questioning "from the time the car was parked near the Coliseum until the point of the end of sexual activity;" (2) S.'s testimony under the prosecutor's questioning "from the time of the defendant's clicking the box cutter to the end of the sexual events;" and (3) T.'s testimony under the prosecutor's questioning "from the point of the conclusion of consensual sex and ending at the point she jumped on Mr. Rodezno's truck." The jurors also submitted the following questions regarding the offenses committed against T.: "Hypothetically, with respect to Count 13 [aggravated kidnapping], if all the jurors are in agreement that kidnapping with intent occurred, but are not in agreement as to which specific act constituted kidnapping, does that constitute a unanimous decision? [¶] With respect to Count 14 [forcible oral copulation with a related aggravated kidnapping sentence enhancement], does an affirmative answer to the prior question dictate an affirmation [sic] of the aggravating clause regarding kidnapping? After receiving the jurors' note, the trial court discussed the matter with counsel, who agreed that the court should recall the jurors for an explanation of their question concerning Count 13. After being recalled to the courtroom, Juror No. 4 stated: "Our thought was in hearing the testimony that there were a couple of different places that might have been construed as kidnapping. And one of those instances seemed clear to some of us to have been kidnapping with intent as described in the law but not to others of us. Whereas for others in the jury, the other event that we construed as kidnapping constituted kidnapping with intent. [¶] So we were in agreement that it had happened at some point, and the issue was whether that, that fact was enough to impact

15

our decision on . . . [count] 14." The court interrupted, and stated, "As to [count] 14, whatever he did that constituted kidnapping, you have to find that it substantially increased the risk of harm to . . . the victim." The court then asked the jurors, "[B]ut as to the first part of your question, so you're saying there are two different places that you ─ two different points at which ─, then Juror No. 4 interrupted, ─ "Two different parts to the overall incident." Juror No. 10 then stated that all of the jurors agreed there was a kidnapping but that "there were two plausible situations that can be construed as kidnapping. Some of us agree that it was number A that constituted a kidnapping. Some of us agree that it was number B that constituted a kidnapping. And a few of us agree, some of us agree that either could have constituted kidnapping, but we're not unanimous on just one of the instances." The court then stated: "But it was all in the continuum of what happened ─" to which Juror No. 10 replied, "That's right."

After the jurors left the courtroom, the trial court further discussed the matter with counsel. Defense counsel argued that the jurors were basically disagreeing on the factual basis for kidnapping and there was a need for a unanimous decision as there were two different incidents regarding T. that were completely separate in time. The court disagreed, noting the jurors said "it's a continuum." Defense counsel complained that the court had not gotten specific enough in terms of what " 'continuum' " meant, because there were two different possible scenarios and facts to this case, one inside the truck and one outside. The court again disagreed, noting that the jurors did not "say anything about inside the truck and outside the truck. . . . They said whatever they're talking about is a continuum. It's all a continuum, but where it started and where it ended, people are not in agreement. But I do think, though, we should tell them that they should agree that the unlawful movement – they should agree that there was an unlawful movement by physical force and they should agree that the unlawful movement occurred with the specific intent to commit rape, sodomy, or oral copulation and that [the ] movement substantially increased the risk of harm to the victim." Defense counsel objected, noting there had been no clarification as to what continuum meant, i.e., the events that occurred outside the truck or the events that occurred inside the truck or all of it. The court replied

16

it did not want to get too deep into the jurors' deliberations by asking them specific things. The court then ruled that as to the first question concerning count 13, its written response would be: "1. There must have been an unlawful movement of a substantial distance by physical force of the victim. [¶] 2. That unlawful movement must have occurred with the specific intent to commit rape, sodomy or oral copulation. [¶] And [¶] 3. That movement substantially increased the risk of harm to the victim." As to the second question concerning count 14, the court's written response would be: "Did whatever he did that constituted kidnapping substantially increase the risk of harm to the victim?"

The next day, defense counsel again asked the court to consider giving the jury an unanimity instruction using the language in CALJIC No. 17.01.[5] After counsel's argument, the trial court denied defendant's request to further instruct the jury on the concept of unanimity. The court explained: "The Court holds firm in what my previous ruling was. And then I will add that the Court does find that this was a continuous course of conduct. [¶] Having had an opportunity to look at the *Cortez* case [*People v. Cortez* (1992) 6 Cal.App.4th 1202 (*Cortez*)], . . . the Court here finds that this kidnapping was a continuous course of conduct and there was no break in it. She never did get away and get to a place of safety and then it start[ed] all over again. So this was a continuous course of conduct. [¶] And I think the instruction that I gave, the response that I gave them, the Court did not want to get into advising them on the actual, how they should deliberate or find the evidence. So I was trying to give them a general instruction and basically just reiterated the CALJIC. So I don't think there's any need to give the unanimity instruction in this particular case."

---

[5]      CALJIC No. 17.01 reads: "The defendant is accused of having committed the crime of ___ [in Count ____]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count ___] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ___], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] or [omission] agreed upon be stated in your verdict."

17

**B.     Analysis**

Defendant first argues the trial court erred by failing to instruct the jury concerning the reasonable belief in consent defense enunciated in *People v. Mayberry* (1975) 15 Cal.3d 143, 155 (*Mayberry*) as part of its instructions concerning the substantive crime of aggravated kidnapping and the aggravated kidnapping sentence enhancements. He contends the omitted instructions were crucial in regard to T. because it was not disputed that she initially consented to accompany him. Thus, the question for the jury was what factually changed the consensual meeting into an aggravated kidnapping. However, as part of its instructions on the substantive crimes of forcible rape, forcible sodomy, and forcible oral copulation, the trial court advised the jury to consider the *Mayberry* defense – namely, that defendant would not be guilty of the substantive sex offenses if he possessed "a reasonable and good faith belief" that the victim "voluntarily consented" to engage in sexual conduct with defendant. (CALJIC No. 10.65.) By finding defendant guilty of the forcible rape, forcible sodomy, or forcible oral copulation committed against S. and T., the jurors necessarily rejected the *Mayberry* defense.[6] Because the acts of kidnapping and the sex offenses "were closely connected in their commission," we conclude that, under any standard of review, any instructional error was harmless because "the jury would not have reached a different conclusion" on the substantive offenses of aggravated kidnapping and the aggravated kidnapping sentence enhancements had they been instructed on the *Mayberry* defense as part of those specific instructions. (*People v. Stitely* (2005) 35 Cal.4th 514, 553, 554 [trial court's failure to advise of *Mayberry* defense in its felony-murder-rape instructions was harmless under any standard of review as the jury's true finding of a sodomy-murder special circumstance allegation necessarily rejected the defense and the commission of the

---

[6]     Consequently, this case is distinguishable from the situations in *People v. Sojka* (2011) 196 Cal.App.4th 733 (*Sojka*) and *People v. May* (1989) 213 Cal.App.3d 118 (*May*), cited by defendant. In those cases, the courts found the failure to give a *Mayberry* defense instruction was prejudicial error requiring reversal because the jury was never asked to consider the issue of defendant's reasonable belief in the victim's consent under other properly given instructions. (*Sojka, supra,* at pp. 738-739; *May, supra,* at p. 128.)

sodomy was closely connected to the commission of the rape].) Accordingly, defendant's contention concerning an instructional error involving the *Mayberry* defense does not require reversal.

We also are not persuaded by defendant's argument that the jury should have been given an unanimity instruction. In a criminal case, "the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) The unanimity requirement is designed to " 'eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid.*) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid*.) Thus, "a unanimity instruction is not required if the evidence shows only a single crime, albeit committed in several possible ways." (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 185; see *People v. Beardslee* (1991) 53 Cal.3d 68, 92 [jury unanimity requirement typically applies to acts that could have been charged as separate offenses]; *Cortez, supra*, 6 Cal.App.4th at p. 1209 [no unanimity instruction where "the kidnapping continued through out the allegedly separate events singled out by defendant"].)

In this case T. testified to a continuous course of detention by defendant beginning from the moment he tightly grabbed her throat inside the truck, and continuing while he dragged her across the truck, demanded oral copulation, held her arm while she urinated outside the truck, dragged her back toward the truck after she temporarily escaped, and then his ultimate release of her outside the truck. And, despite defendant's argument to the contrary, the jury's request for a read back of the portion of T.'s testimony from the point of the conclusion of the consensual sex and ending when she jumped on Mr. Rodezno's truck demonstrates that the jury was focused on the continuous course of

19

defendant's criminal conduct. Consequently, the trial court correctly ruled there was no need for an unanimity instruction. " 'Once the discrete event is identified, for example, the [aggravated kidnapping of T.], the theory each individual juror uses to conclude the defendant is criminally responsible need not be the same and, indeed, may be contradictory.' [Citation.] It suffices if the jury unanimously agrees that the prosecution has proven beyond a reasonable doubt every element necessary to establish guilt of a discrete crime." (*People v. Smith* (2014) 60 Cal.4th 603, 618.) None of the cases relied on by defendant warrants a different result.

Nor do we see any merit to defendant's related argument that the court's response to the jury's questions concerning "the unanimity requirements" was incomplete and failed to adequately and correctly answer the questions. "[S]ection 1138, which requires the court to provide the jury any desired information 'on any point of law arising in the case[,]' . . . imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212 (*Gonzalez*).) Where "the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Gonzalez,* at p. 1213.) Here, the jurors' questions did not express any concern about the instructions. They indicated they had already resolved that defendant had committed "kidnapping with intent," but expressed concern only as to whether each juror must rely on the same evidence to find defendant guilty of that crime. The court's reinstructions appropriately refocused the jury's attention to those instructions concerning asportation and substantial risk of harm without unduly interfering with the jurors' consideration of the facts. We see no basis to reverse on this ground.

## III. Combined Effect of Purported Errors

We reject defendant's contention that the combined effect of the previously discussed purported errors requires reversal. Either considered individually or collectively, any purported errors were not prejudicial and did not deprive defendant of a fair trial or reliable verdicts.

**IV.    Denial of Defendant's Motion to Unseal Juror Contact Information to Aid in Filing Motion for New Trial Based on Juror Misconduct**

**A.    Relevant Facts**

During the trial, the jury heard testimony from both S. and defendant that while they were in defendant's truck they drank vodka from a 1.75 liter Ketel One bottle. S. testified the bottle was initially full but over the course of about 20 hours, defendant had consumed a lot of the vodka. She did not drink any alcohol during the night, but the next day when it was daylight, defendant told her he wanted her to drink because it would "loosen" her up. She did not want to drink but told defendant to pour her a drink in a cup. At first she pretended to drink the vodka and then she actually drank it because she was scared. She drank only once, and, later, after she threw up, defendant did not make her drink any more. Defendant testified the vodka bottle was initially full. The bottle, admitted into evidence, showed that about two-thirds of its content had been consumed. Defendant and S. drank vodka together on two occasions, once for five or 10 minutes and later for another 45 minutes. At that point, they were "kind of drunk." Defendant drank the vodka straight. He did not remember how much S. had drunk; "we were just put[ting] it in a cup and drinking it." He did not know if S. drank "half of it." He asserted only that, "We both drink it. It's not like only I was. It's not only by myself drinking. We both drinking." Just before he parked his car to allow S. to leave, he "realized that the alcohol wasn't free," and he told her, "you know what, you drink my alcohol, we have fun," and he told her to just get out. Defendant did not think S. was drunk when he dropped her off at the BART station.

In closing argument, the prosecutor argued defendant's testimony was not credible in many respects, but, in part, corroborated S.'s testimony including the consumption of vodka. The prosecutor argued: "Again, the vodka he said himself it was full. This bottle was full. I don't think he said there was any mixing. Straight vodka. For those of you who drink, think about that. How much vodka you can consume or one could consume in a few hours, if that's the truth. As the defendant said it is, it was a few hours. It doesn't

21

make sense, you can't do it. This is over the course of a day or at least 20 hours, and he says himself, it was full. That's corroboration." The prosecutor later argued, "He claims they were drinking vodka straight. Again doesn't fit reasoning, commonsense, and the reality of how much alcohol was left in that bottle." In asking the jury to reject defendant's testimony regarding the amount of alcohol that he claimed S. drank, the prosecutor argued: "And again, we talked about the amount of alcohol that he says she consumed. Does she sound intoxicated? Does she sound drunk on that [9-1-1] phone call? No."

Before sentencing, defendant filed a motion seeking access to juror contact information to aid in the filing of a motion for a new trial based on juror misconduct. In support of the request, defense counsel submitted a declaration in which he averred as follows: "Immediately after the jury verdict in this case, I spoke with jurors about the case. I was informed that Mr. Yohannes' testimony was disbelieved because of his explanation regarding the consumption of alcohol with S. Doe. According to jurors, S. Doe described herself and Mr. Yohannes consuming the bottle of alcohol, which was introduced into evidence by the prosecution, over a 20 hour period. Mr. Yohannes testified they consumed the alcohol over a few hours. In deciding who was telling the truth, a juror relied on his/her medical expertise and opined that the alcohol bottle was too large in size to have been consumed within a few hours, as described by Mr. Yohannes, without either of them dying from alcohol poisoning. The juror's opinion was proclaimed to be derived from the vast medical experience in dealing with patients, not from any medical evidence presented in court. Because of the proclaimed medical expertise, the jurors disbelieved Mr. Yohannes' testimony in its entirety and believed S. Doe's version." According to defense counsel, no expert evidence regarding the effects of alcohol on the human body within particular time periods was admitted into evidence during the trial. Such evidence would require the requisite medical foundation before it could be admitted. Therefore, the juror's opinion was improper extrinsic evidence constituting misconduct.

The trial court heard argument from both counsel regarding defendant's request. Defense counsel repeated his understanding of the jurors' comments. Because the jurors did not say that the medical opinion was the only basis for not believing defendant or just one of their reasons, defendant sought to obtain the jurors' personal contact information to pursue a potential motion for a new trial. In opposition, the prosecutor noted he believed that one juror was an "OB-GYN" doctor. He also indicated that he had been present when defense counsel spoke with the jurors, and he did not hear what defense counsel heard with regard to a juror's medical opinion that either defendant or the victim would have been dead if they had consumed the amount of alcohol as testified to by defendant. The prosecutor noted his understanding of the conversation was that the jurors had discussed the amount of alcohol consumed, had looked at the bottle in the jury room, and they all agreed that the amount of alcohol that defendant claimed to have been consumed during his encounter with S. Doe could not have been consumed during that time period.

In denying defendant's request, the trial court explained: "The Court has read the moving papers, and the Court heard all of the testimony. First of all, that was not the only point of contention between the differences in the testimony between the victim S. Doe and Mr. Yohannes when he testified. And the other thing is that that was an extremely large bottle of Ketel [One vodka]," and "almost anyone looking at that bottle would know that that was an extremely large bottle. And I think that was just the jury deliberating and discussing what, in fact, was evidence that was in evidence. [¶] So based on all this, the Court does not find that the facts that have been enumerated in this motion are sufficient to establish good cause for the release of jurors' personal identification information."

B.    Analysis

The unsealing of juror contact information in a criminal proceeding is governed by sections 206 and 237 in the Code of Civil Procedure. Those sections provide, in pertinent part, that a criminal defendant or counsel may petition the court for access to personal juror identifying information necessary for the defendant to communicate with jurors for

23

the purpose of developing a motion for new trial. (Code Civ. Proc., § 206, subd. (g), 237.) The petition must be supported by "a declaration that includes facts sufficient to establish good cause for the release of the juror's personal indentifying information." (Code Civ. Proc., § 237, subd. (b).) [7] We review the trial court's denial of the motion for the release of personal juror identifying information for an abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317; see *People v. Castorena* (1996) 47 Cal.App.4th 1051, 1065 [trial court's failure to question jurors regarding a juror misconduct claim "presents an issue of abuse of discretion, not one of constitutional magnitude"].) We will uphold a trial court's exercise of its discretion unless it is arbitrary or capricious. (*People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

Defendant argues his trial counsel's declaration established a prima facie showing of good cause for release of the jurors' personal identifying information so that counsel could interview the jurors regarding the use of extrajudicial information during deliberations. We disagree. "Certainly a juror commits misconduct by asserting a 'claim to expertise or specialized knowledge of a matter at issue.' (*In re Malone* (1996) 12 Cal.4th 935, 963 [50 Cal. Rptr. 2d 281, 911 P.2d 468].) Yet 'it is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial.

---

[7] Section 237 of the Code of Civil Procedure further provides, "The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure." (*Id.*, subd. (b).) "If the court does not set the matter for hearing," as in this case, "the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure." (*Ibid.*) Here, the trial court stated its reasons for denying defendant's motion on the record at sentencing, but the record does not contain a minute order setting forth the reasons or express findings of the court. Defendant makes no argument that the lack of stated reasons in a minute order requires reversal. In all events, any such argument would be unavailing. The court's reasons for denying the motion are stated in the reporter's transcript and there is no reasonable possibility the court's decision would be different were we to remand for the entry of an order repeating those reasons.

Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work.' (*Ibid*.; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1265-1267 [120 Cal.Rptr.2d 432, 47 P.3d 225] [(*Steele*)].)" (*People v. Yeoman* (2003) 31 Cal.4th 93, 161 (*Yeoman*).) Here, trial counsel's declaration "does not show that [a juror] offered the jurors any basis for deciding the case other than the evidence and testimony presented at trial," and the reasonable inferences that could be drawn from that evidence. (*Ibid*.) "No declaration suggests the juror made any assertion inconsistent with the properly admitted evidence and testimony." (*Ibid.*) Defendant complains, however, that "jurors discussed material [from] outside the record based on a juror's medical expertise and experience through his practice to determine the question of [defendant's] credibility or lack thereof." However, the trial court here, having heard the evidence, "was well positioned" (*Steele, supra*, 27 Cal.4th at p. 1267) to determine whether trial counsel's declaration "set forth a sufficient showing to support a reasonable belief that jury misconduct had occurred" in this case. (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552 (*Rhodes*).) Specifically, the trial court could reasonably find that the juror's comment about the effect of drinking a large quantity of alcohol in a short amount of time did not demonstrate a prima facie showing suggesting that the jurors "engaged in inappropriate discussions during deliberations which may have improperly influenced the verdict." (*Id*. at p. 554.) As the court commented in *Trenier v. California Investment & Development Corp*. (1980) 105 Cal.App.3d 44, "it is hardly necessary to seek out expert opinion on what will happen if one ingests as alleged in this complaint, 'grossly excessive amounts of alcohol, to wit, 27 ounces of straight Jack Daniels Whiskey and four ounces of Tequila within a period of less than two hours.' To drink alcohol in such quantity and at such speed involves dangers known to anyone, young or old . . . ." (*Id.* at p. 50; see *Yeoman, supra*, 31 Cal.4th at p. 162 [jurors committed no misconduct by recounting personal experiences involving drugs in evaluating defense claim that defendant's conduct was related to his drug use]; *People v. Manson* (1976) 61 Cal.App.3d 102, 204, fn. 103 ["The effect of alcohol is of sufficiently common knowledge to obviate the use of expert testimony."].)

Contrary to defendant's contention, the cases he relies on are factually distinguishable and in all events, do not warrant a different result. Accordingly, "[h]aving failed to provide an adequate, preliminary showing of misconduct, defendant was not entitled to discovery of the jurors names, addresses, and telephone numbers; and the trial court did not err in denying defendant's motion." (*Rhodes, supra,* at p. 554.)

## V. Sentence

At sentencing the court stated it was imposing an aggregate sentence of 306 years to life in state prison. However, the indeterminate and determinate terms actually imposed aggregate to 308 years to life, consisting of an aggregate indeterminate term of 300 years to life (12 consecutive terms of 25 years to life (counts 1-11 & 14)) and an aggregate determinate term of eight years (consecutive term of six years (count 16), consecutive term of two years (lesser included offense of count 20), concurrent term of two years (lesser included offense of count 18), and concurrent term of four years (firearm enhancement)). The court's minute orders reflect that the court imposed an aggregate sentence of 310 years to life. Although neither party has made a request, given the discrepancies in the trial court's oral pronouncement of sentence and its minute orders, we deem it appropriate to remand the matter for resentencing.

## DISPOSITION

The matter is remanded to the trial court for resentencing. In all other respects, the judgments are affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

26

Pollak, J.